FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

00 JUL -7 P 1:

U.S. DISTRICT COURT
N.D. OF ALABAMA

FRANK L. RICHMOND,

     Plaintiff,

vs.                                             CASE NO. CV-98-J-1805-S

JIM WOODWARD, et al.,

     Defendants.

**ENTERED**

**JUL ·7 2000**

## MEMORANDUM OPINION

    Currently pending before the court is the defendants' motion for summary judgment

(doc. 46), which was filed July 14, 1999.  No timely brief in opposition was received by the

court.[1]  Both parties have also filed evidentiary submissions in support of their respective

positions.  The court has reviewed the motion, the memorandum of law and the evidentiary

submissions of the parties.

---

    [1]This case was transferred to the undersigned judge on April 1, 2000. On April 12, 2000, this court entered a summary judgment scheduling order allowing the plaintiff until May 9, 2000 to file a response to defendants' motion. On April 26, 2000, the court amended the April 12 order to allow the plaintiff until May 24, 2000 to respond. On May 19, 2000, the plaintiff filed a motion to extend the plaintiff's deadline by sixty days. On May 24, 2000, the plaintiff filed an amended motion to extend briefing deadlines to allow an amended complaint to be filed. These motions were denied by the court on June 5, 2000. On June 6, 2000, the plaintiff filed a motion for extension of time, which was denied on June 8, 2000. On June 12, 2000, the plaintiff filed a brief in opposition to the defendant's motion for summary judgment and a motion for leave to file the same. The reasons given for the request to file the brief late were found by the court to not be meritorious. As such, that brief was stricken and the motion to file a supplemental brief on June 13, 2000 was also denied. The evidence filed by the plaintiff on March 30, 2000 has, of course, been considered by this court.

*101*

# I. PROCEDURAL HISTORY

Plaintiff commenced this action on July 14, 1998 by filing a complaint alleging the defendants discriminated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 216 and 626; 42 U.S.C. §1981 and 42 U.S.C. § 1983; and further stating various state law claims. The plaintiff filed an amendment to that complaint on November 10, 1998, and a second amended complaint on March 9, 1999.[2] The second amended complaint ("amended complaint") names defendant Jim Woodward in his individual capacity, but not defendant Mike Hale.[3] All other named defendants were dismissed by court orders on January 13, 1999 (doc. 32), March 9, 1999 (doc. 40), and June 21, 1999 (doc. 44). This court considered this motion upon the pleadings, briefs, and evidentiary submissions. Having considered all of the foregoing, the court concludes that the motion for summary judgment is due to be granted on all counts of the complaint.

---

[2]The court notes that the second amended complaint was, at least in part, necessitated by a contested sheriff's race in Jefferson County, so that Jim Woodward, was replaced by Mike Hale, and then Jim Woodward was reinstated to the office of Sheriff by the Alabama Supreme Court during the pendency of this litigation. *See e.g.,* plaintiff's second amended complaint at ¶ 9, depo. of Woodward at 10 (stating he was Sheriff from April, 1996 until January, 1999). Under Mike Hale, Michael Linn Moore was the chief deputy. Depo. of Moore at 7, depo. of Hale at 67. Under Woodward, Jim McCreless was Chief Deputy. Depo. of McCreless at 16.

[3]However, the plaintiff has repeatedly represented that his suit does name Mike Hale individually and Judge Pointer's rulings seem to have allowed such a suit to proceed. *See e.g.,* Order of June 21, 1999 (doc. 44).

## II. FACTUAL BACKGROUND

In the light most favorable to the plaintiff, the facts of this case are as follows:

The plaintiff began working for the Jefferson County Sheriff's Department on May 22, 1972. Amended complaint at ¶ 8. The plaintiff alleges he was discriminated against through a lateral transfer, placement on administrative leave, and denial of a promotion because of a disability and based on age (fifty-two), gender (male), race (white) and religion (Jewish). *Id.* at ¶ 3. Plaintiff alleges that he has a disability from an on-the-job injury to his back in 1996 and that this back injury prevents him from participating in "several major life activities." *Id.* at ¶¶ 8, 18; depo. of plaintiff, submitted as exhibit 1 to defendants' motion for summary judgment, at 180, 182. He alleges that when he returned to work after having a heart attack, he was passed over for a promotion. Amended complaint at ¶ 19. The plaintiff states that Steve Green, his supervising lieutenant, made a comment about his back injury one time. Depo. of plaintiff at 179-180. The plaintiff claims that in April, 1997, he presented a demand under the ADA as well as a letter from his physician stating that he was fit for duty. Amended complaint at ¶ 20. Sheriff Woodward testified he was not aware that plaintiff had a physical disability. Depo. of Woodward at 76. Woodward also stated that the letter from his physician stating he was fit for duty did not reference any physical impairment. *Id.* at 77. Greene stated that he was aware that plaintiff made a request for accommodation, but that was all he knew about it. Depo. II of Green at 167.

3

## A. The report writing

The plaintiff testified that he had problems with his supervisor, Lieutenant Steve Greene, from the time Lieutenant Greene assumed this position in April, 1997. Depo. of plaintiff at 75-76; depo. I of Greene at 25. He states that his work ability was under attack from this time forward. Depo. of plaintiff at 100, 184. He states that his incident reports were never questioned before April of 1997 when Steve Greene became in charge of the sheriff's substation in Center Point.[4] *Id.* at 122. Sergeant Don Williams became the plaintiff's direct supervisor on March 17, 1997. Depo. of Williams at 10. The plaintiff testified that the harassment over his incidents reports was in retaliation, but did not testify as to why his supervisors allegedly retaliated. Depo. of plaintiff at 190.

Williams testified that as plaintiff's supervisor, he was responsible for bringing up the quality of the plaintiff's reports. Depo. of Williams at 13. He stated Lieutenant Greene did not bring the quality of the plaintiff's reports to his attention. *Id*. at 14. Williams stated that in spite of working with plaintiff on his reports, the quality of them did not improve. *Id*. at 15-16, 40. Williams believed the plaintiff was putting forth his best effort. *Id*. at 16.

On March 24, 1997, Greene wrote to Williams stating that the attached report of plaintiff's was unacceptable. Exhibit 10 to defendants' submissions. On March 20, 1997

---

[4]In fact, the plaintiff had been warned concerning his submission of inadequate reports on three separate occasions in 1985. See Exhibits 21-23 of defendants' submissions. The plaintiff also received a warning in 1988 for drawing his weapon in a "joking-type manner" and carrying a weapon for which he had not qualified. Exhibits 24-25.

and April 2, 1997, disciplinary action reports were sent to Greene by Williams alleging that the plaintiff violated radio operating procedures. Exhibits 11 and 12 to defendants' submissions. On April 23, 1997, Williams wrote to Greene stating that he had constant problems with plaintiff since he (Williams) was transferred to the Center Point Day Shift and requested that the plaintiff be transferred to a different division. Exhibit 14 to defendants' submissions. Williams explained at deposition that because the plaintiff could not seem to write reports up to standard, he suggested he be transferred to a division where report writing was not required. Depo. of Williams at 41.

The plaintiff states that he met with the Jefferson County Personnel Board to complain of harassment by his supervisor Greene on April 25, 1997, and reported further harassment on May 16, 20, and 22, 1997. He states he was then reprimanded on June 11, 1997[5] and the Personnel Board did nothing to prevent this harassment.[6] Amended complaint at ¶ 21; depo. of plaintiff at 186-187. On May 10, 1997, Greene was sent a letter by Sergeant J.T. Galloway regarding the inadequacies of a report submitted by plaintiff. Exhibit 16 to defendants' submissions. On May 14, 1997, Williams wrote Greene regarding inadequacies in the plaintiff's reporting. Exhibit 17. On May 16, 1997, Greene wrote to Captain Billy

---

[5]The court notes that this was a reprimand by Williams. Exhibit 8 to defendants' submission.

[6]The plaintiff's suit against the Jefferson County Personnel Board was dismissed by previous court order. The court notes that it is a distinct legal entity from the Jefferson County Sheriff's Office.

5

James stating that fifteen of the plaintiff's reports, from 3-20-97 until 5-14-97 were below the expected standards. Greene states in this letter that Don Williams' opinion was that the plaintiff was not capable of properly writing reports and should be transferred to a division where the same was not required. Exhibit 9 to defendants' submissions. *See also* Exhibit 13, detailing alleged inadequacies of plaintiff's reports; depo. II of Greene at 50. Greene sent a copy of this letter to plaintiff, informing him that further deficiencies would result in disciplinary action. Exhibit 18 to defendants' submissions; depo. of James at 11-12. On May 21, 1997, Captain James wrote to Chief Jim McCreless stating that he agreed with Greene's assessment of plaintiff and supported Greene's suggestion that the plaintiff be transferred. Exhibit 19 to defendants' submissions. James stated that after he received complaints about the plaintiff's report writing, he also heard the plaintiff was having trouble maintaining the appearance of his uniform and also heard reports of plaintiff's improperly handling the arrest of juveniles. Depo. of James at 20-21.

The plaintiff alleges on July 31, 1997, he was harassed, ridiculed, and removed from patrol. Amended complaint at ¶ 22. He states that due to his handling of the arrest of three children when responding to a burglary, he was not allowed to do anything for thirty days.[7]

---

[7]This was apparently in response to plaintiff's decision to handcuff three children after apprehending them for burglary. No one contests that the children were not handcuffed until plaintiff arrived with them at the sheriff's department. Depo. of plaintiff at 84-86, 88. Either Greene or Williams came up to the plaintiff and told him to "take the damn handcuffs off these children." *Id.* at 92, 94-95. The plaintiff states his immediate supervisor, Sergeant Don Williams was also present. *Id.* The plaintiff alleges that, at that point, the three children started crying out of fear they had gotten the plaintiff in trouble. *Id.* at 96. Williams sent a memo to Greene detailing the arrest of the children by plaintiff. Exhibit 20 to defendants' submissions.

Depo. of plaintiff at 82-83. He states he had to sit on a stool and do nothing the entire time. *Id.* at 99, 100. He had no reduction in pay or benefits, but perceived this as a disciplinary action or harassment.[8] *Id.* at 100-101, 127. He testified he had no idea why he was given a desk assignment, although he stated it was in retaliation for complaining about Greene's criticisms of his report writing.[9] *Id.* at 112, 190. The plaintiff alleges that Williams told him that "everything I do to you is because this guy [Steve Greene] tells me to. He's my boss. And this guy tells me to do it." *Id.* at 99.

The plaintiff admitted the first criticism of his report writing was in March, 1997, by Williams, before Greene began his duties in Center Point. Depo. of plaintiff at 191-192. He states Williams was counseling him about his report writing. *Id.* at 192. The plaintiff also states that in March, 1997, he had already complained to Captain James, Chief McCreless, the sheriff, internal security, and the Personnel Board about the criticisms of his report

---

[8]The plaintiff alleges that during this thirty days he overheard a conversation that convinced him Steve Greene was trying to get rid of him because of his religion. Depo. of plaintiff at 103-104. Even if this testimony was found credible by a jury, no mention of the plaintiff's religion was made. He alleges that listening through a closed door, he heard Don Williams state "Well, you know what he is." *Id.* at 104. He heard this two or three times with his ear stuck to the outside of the door. *Id.* at 123. The plaintiff agreed that this statement could have been referring to things other than the plaintiff's professed religious beliefs. *Id.* at 105. However, the plaintiff also testified that Steve Greene may have heard that the plaintiff had a Jewish brother-in-law, and that he never discussed religion with anyone. *Id* at 121. Based on the plaintiff's claim that Lieutenant Greene was trying to get rid of him, this court finds that even if a jury believed this testimony, it is wholly insufficient as a matter of law to support a finding of religious discrimination.

[9]Another time, plaintiff states he was given thirty days of desk duty because Steve Greene did not like him and also because he had heard rumors the plaintiff had a Jewish brother-in-law. Depo. of plaintiff at 120-121, 127-128.

writing.  Depo. of plaintiff at 194.  He stated the further criticisms were in retaliation, and

then he was given the thirty days in retaliation for complaining.  *Id*. at 195.  His testimony

was as follows:

> Q.  You are not claiming that Mel Bailey retaliated against you?
> A.  No, unh-unh.  These people didn't do it.  Steve Green retaliated against me
> for complaining about him harassing me about my reports.
> .....
> Q.  So, it all started in March --
> A.  After March 17th.
> Q.  Actually started with Don Williams in March of 1997?
> A.  Yeah, yeah.
> Q.  Bringing you in and saying your reports are inadequate?
> A.  Yeah, under the direction of Steve Greene.
> Q.  Then Lieutenant Greene –
> A.  Came there April the 1st and continued the harassment.

Depo. of plaintiff at 198.  The plaintiff testified the harassment from Greene and  Williams

was because they did not like his "age, race, religion, personality."  Depo. of plaintiff at 233.

The plaintiff received a written reprimand on June 11, 1997 from Williams, stating his

reports were written in a sloppy and unprofessional manner.  *See* Exhibit 8.  Williams

testified he issued this reprimand on his own initiative because plaintiff's report writing skills

had not improved.  Depo. of Williams at 69.  Williams testified that no one ever told him

they wanted to get rid of the plaintiff from the sheriff's office or that Williams should assist

in creating reports to force the plaintiff from the sheriff's office.  *Id*. at 94.

Greene stated that when he began his duties as lieutenant at the Center Point

substation, he was looking at everybody's work.  Depo. II of Greene at 38.  He further stated

the plaintiff was never assigned to a desk position at Center Point, but rather taken off patrol for two or three days. Depo. II of Greene at 40, depo. of Williams at 43-44. He stated this was primarily caused by the plaintiff's improper handling of the arrest of the juveniles. Depo. II of Greene at 42. Greene discussed his concerns with Captain James. *Id*. at 49. The plaintiff was assigned during this time to help answer phones, assist the public with filling out and picking up reports, and assist the detective division with the phones. *Id*. at 108-109. Greene stated he never told anyone the plaintiff had to sit and do nothing during this time period. *Id.* at 145, 149.

The plaintiff filed an EEOC claim on August 1, 1997 and states he was removed from his regular duties on August 4, 1997. Amended complaint at ¶¶ 23, 24. Plaintiff requested a transfer on August 13, 1997. Amended complaint at ¶ 25. On August 4, 1997, Sheriff Woodward wrote to Ben Payton, the Director of the Personnel Board, requesting a psychological evaluation for the plaintiff. That letter states "Deputy Richmond has been relieved of patrol duties and is presently assigned to substation duties in an attempt to lessen the emotional strain." Exhibit 15 to defendants' submissions.

On August 18, 1997, the plaintiff filed a second charge of discrimination with the EEOC against the Sheriff's Department attached to plaintiff's complaint.[10] The same day,

---

[10]Plaintiff's deposition testimony conflicts with his amended complaint. The plaintiff testified at deposition that this second EEOC complaint was because of the Nazi placard incident. Depo. of plaintiff at 202, 221.

he was notified by the Personnel Board that he should report to Dr. Warren Jackson, at UAB, for a psychological evaluation. Amended complaint at ¶ 26.

### B. The iron cross/Nazi placard

Plaintiff alleges that he lived in Germany from the time he was three until he was seven years old and that his mother was of German Jewish descent. Amended complaint at ¶ 17. On his Personnel Update Form for 1997, the plaintiff listed his religious preference as "Pres." Exhibit 6 to defendants' submissions. After all of the incidents in question, the plaintiff in 1998 listed his religious preference as "Jewish." Exhibit 7 to defendants' submissions. *See also* depo. of Woodward at 80. The plaintiff had no obligation to provide any information on this line of the update form at all. Depo. of Moore at 62-63.

On August 20, 1997, the plaintiff alleges a "Nazi placard" or "iron cross" was taped to Greene's door at the Center Point substation and no one undertook any investigation regarding this occurrence. *Id.* at ¶ 27; depo. of plaintiff at 188. The plaintiff states this happened while he was spending the thirty days sitting up front and doing nothing. Depo. of plaintiff at 189. The plaintiff admitted everyone he spoke to told him the "Nazi placard" was a joke, but he insisted that it was not a joke and that he found it offensive. *Id.* at 203.[11] The plaintiff apparently alleges he was singled out by the Sheriff's Department because he is Jewish. Depo. of Linn Moore at 12.

---

[11]The content of this placard stated in German and English "Group Leader, Lieutenant Steve Greene, The Commander of the Army, Ground Forces East." Defendants' Exhibit 28 to defendants' submissions. McCreless stated that Greene at the time was in charge of the Patrol Division East and was known as Commander of the East Division. Depo. of McCreless at 95-96.

The plaintiff testified he took the placard off of Greene's door, copied it, and put it back up, because "I don't steal or take anything." Depo. of plaintiff at 264. The plaintiff was offended by this because he believed it to be a Nazi placard, although he admits it contains no reference to the Nazi party and no swastika. *Id*. at 266-267. The plaintiff alleged he had seen Hitler wear a similar cross and thus found it offensive. *Id.* at 267. He admits the placard had no wording about Jews, no wording about Nazis, no swastika, and prior to this incident the plaintiff had never seen any type of anti-semitic literature at the station. *Id.* at 267-268, 270-271. *See* Exhibits 27 and 28 to defendants' submissions. McCreless testified that the placard contained no connotations about nationality either. Depo. of McCreless at 102.

Sheriff Woodward testified that the iron cross was given as a medal of honor by the German Army in World War I and World War II, as far as he knew. Depo. of Woodward at 15. He knew of no connection between the emblem and a Nazi past. *Id.* McCreless testified that he was not aware of the iron cross' use as an insignia by Nazis. Depo. of McCreless at 109. Moore testified that he knows what an iron cross looks like and that the German Army used it as a medal of some type during World War II and possibly before this time. Depo. of Moore at 50-51, 52-53. Greene testified that he had never seen a similar symbol or cross before. Depo. I of Greene at 75. Greene also stated that he guessed the foreign language on it was German but has no idea of what the German words on the placard

11

meant.[12]  *Id.* at 76.  Hale testified that he did not know what an iron cross was.  Depo. of Hale at 78.

Woodward had seen the plaintiff's complaint regarding this incident, in which the plaintiff referred to the cross as a "Nazi symbol."  Depo. of Woodward at 15.  It came to him through the chain of command in the department, so he received it from Chief McCreless. *Id.* at 17-18.  When he received the complaint, he followed normal procedure, which entailed him telling McCreless to tell James to investigate it.  *Id.* at 134-135.  To the best of Sheriff Woodward's knowledge, an investigation of the incident was done by Captain James.  Depo. of Woodward at 19.  McCreless stated that he told James to look into the matter.  Depo. of McCreless at 92.  He was told by James that it was just a joke the deputies pulled on Lieutenant Greene.  Depo. of McCreless at 91; *see also* depo. of James at 29-30.  Therefore, he took no further action, although he understood that plaintiff took it as an insult.  Depo. of McCreless at 92.  The substance of James' report was that two deputies had placed this on

---

[12]In response to the plaintiff's attorney's questions at deposition, Greene testified that he did know that "führer" meant leader, but could not account for how he came by that knowledge. The following exchange took place:

> Q. How did you come to know that furor (sic) also describes leader in Germany?
> A. Furor (sic) is the word for leader, is my understanding.
> Q. And how did you come by that understanding?
> A. I'm sure I've heard it or somebody told me.
> Q. Who told you?
> A. I couldn't – I don't know.
> Q. Have you always known that?
> A. Not since I was born.  I mean, at some point you learn things.  I couldn't say exactly when I learned it.
> Q. When did you learn that?
> A. Again, I couldn't say exactly.

Depo. I of Greene at 87-88.

Lieutenant Greene's office door and that he came by, saw it, laughed, took it down and threw it in the garbage. Depo. of Woodward at 20. It had been investigated to see if it was intended to offend anyone, and the department concluded it was not.[13] Depo. of Woodward at 175. Woodward stated he thought the placard was a joke. Depo. of Woodward at 37-38. He was also told that all of the people on Lieutenant Greene's shift took it as a joke. *Id.* at 39. Williams stated that someone was playing a joke on Greene and that was why it was hung up at his door. Depo. of Williams at 95.

Greene testified that the placard was meant as a joke towards him because during this time, lieutenants' titles were being changed. He states this was a continuing joke about how he would be referred to in the future. Depo. I of Greene at 78-79. He continued:

> There were other changes going around, such as the communication lieutenant, I think he was now called the bureau chief or something like that. So, they were simply making jokes about what are you going to be referred to, the east lieutenant, the east commander, such as that. So, it was simply an in-house joke about what are you now going to be referred to as since you're not an evening shift, day shift or night shift lieutenant.

Depo. I of Greene at 79. Greene stated that the two deputies who hung the sign up came to him and told him they did it, so he saw no reason to undertake an investigation. Depo. I of Greene at 81, 106-107. He stated he realized it was a joke and did not pay much attention to it. Depo. I of Greene at 84.

James testified that he was not asked to do any formal investigation, but that:

---

[13]Woodward admits that the placard was a poor joke, but not intended to offend anyone. Depo. of Woodward at 176.

... immediately I go out to the substation and I inquire of Lieutenant Greene –
first of all, I look around, you know, at all of the bulletin boards and halls and
things and see if I can see it. But apparently by the time it hit the news, it had
done been taken down. And I didn't see, you know, anything posted up. And
I asked Lieutenant Greene, I said what is this about? And -- you know, the
article.

And he said this is just something the guys – it wasn't Nazi, it was just
a joke the guys played on me while I was gone to lunch. I read it and laughed
at it and – you know, he said it was nothing – he said it wasn't anything – I
said was it derogatory against Frank Richmond or meant to harm Frank in any
way? And he said no, it was aimed at him. So that was about it.

Depo. of James at 70-71. Greene's testimony about this conversation was substantially

similar to James'. Depo. I of Greene at 109-110. McCreless testified that he discussed this

incident with Greene and was told that it was a joke and that "the men were just messing with

him." Depo. of McCreless at 90. He further states that it was not directed at plaintiff,

although he heard plaintiff was offended by it. Depo. of McCreless at 90.

The plaintiff alleges statements by Woodward to the press were in retaliation for his

complaint about the Nazi placard. *Id.* at 230. However, the plaintiff admits he or someone

on his behalf contacted the press first concerning the placard and a reporter then followed up

by contacting Sheriff Woodward. *Id.* at 242. The plaintiff then states he did not contact the

press about this incident and he does not know how they found out. Depo. of plaintiff at 243.

An article concerning the placard incident appeared in the Birmingham Post-Herald on

August 25, 1997. Depo. II of Greene at 155.

### C. Administrative Leave and Psychological Evaluation

14

The plaintiff states he was placed on administrative leave for thirty days, beginning August 28, 1997, pending the results of his psychiatric evaluation. Amended complaint at ¶ 30; depo. of plaintiff at 203-204, 222. He states the sheriff placed him on administrative leave for five days and the Personnel Board added twenty-five more days to this. Depo. of plaintiff at 204; depo. of Woodward at 67, 73. The plaintiff alleges the Personnel Board would not let him sit for the Sergeant's Promotional Examination while he was on administrative leave. Depo. of plaintiff at 204. Woodward testified he never told the Personnel Board not to let the plaintiff take the sergeants exam offered during this time period.[14] Depo. of Woodward at 150.

After consideration of the dates of the events in question, the plaintiff admitted the requirement of the psychiatric evaluation could not be in retaliation for his EEOC complaint about the "Nazi placard" because he received the letter from the Personnel Board regarding his placement on leave and need to go to Dr. Jackson the same day that he noticed the placard. Depo. of plaintiff at 211-212. He changed his mind immediately after this testimony and stated it was in retaliation. *Id*. at 213. He later testified he was placed on administrative leave because of a belief he willfully did not show up for his appointment with Dr. Jackson, and not because he filed the EEOC charge over the "Nazi placard." *Id*. at 239-240.

---

[14]The sheriff's department has no authority over the personnel board. Rather, it is governed by a group of citizens which oversee the three member board. Depo. of Mike Hale at 10, 70.

Sheriff Woodward stated that evaluations of plaintiff's performance began before the Nazi placard incident and were unrelated to it and that no action was taken against the plaintiff because he complained about the placard.[15] Depo. of Woodward at 32. Woodward testified the plaintiff was sent to see Dr. Jackson because of "reports that he talked to his gun and petted it, that he didn't handle cases quite exactly as he should, he didn't make his reports proper, he couldn't fill out a report that was acceptable." Depo. of Woodward at 34, 48-49. McCreless testified this decision was actually made by Ben Payton, based on the sheriff's recommendation. Depo. of McCreless at 63. He stated this decision came up through the chain of command – he made the suggestion to Woodward, James made the suggestion to him. *Id* at 64-65, 83.

The plaintiff filed EEOC charges on September 4, 1997, and October 8, 1997, alleging that his appointment with Dr. Jackson was rescheduled in retaliation for a previous EEOC complaint. *Id.* at ¶¶ 33, 35, depo. of plaintiff at 224. *See* depo. of Woodward at 79. The plaintiff filed a further EEOC charge on November 13, 1997 apparently because Dr. Jackson would not release his report to the plaintiff as part of the ongoing campaign of harassment

---

[15]The term placard is perhaps inappropriate, but the plaintiff called the piece of paper this so for consistency, this court shall refer to it similarly as a "Nazi placard" or as an "iron cross." *See* depo. of plaintiff at 24-28. Greene testified it was actually a piece of paper. Depo. I of Greene at 73.

against him by the Jefferson County Personnel Board. *Id.* at ¶ 40. Plaintiff again filed a charge of discrimination on January 26, 1998.[16]

The plaintiff complains that unidentified personnel at the Sheriff's Department sent a letter to the doctor scheduled to conduct plaintiff's psychiatric examination.[17] Amended complaint at ¶ 32. He further alleges that "Steve Greene, a lieutenant, in conspiracy with Don Williams, sent libelous, slanderous material - Exhibit 21- over to the doctors there at Smolian Clinic saying -- ask him does he stroke his gun at night and want to kill somebody...." Depo. of plaintiff at 215. He states this was in retaliation for his complaining about the Nazi placard incident. *Id* at 216. He states the letter was sent to influence Dr. Jackson. Although he admits the letter is not signed, the plaintiff testified that a lady who is now dead that was sitting next to the fax machine told him Steve Greene sent it. *Id.* at 217. She did not see the content of the letter before Steve Greene faxed it. *Id* at 226. The plaintiff states this was done to have him sent to Bryce in retaliation.[18] *Id.* Woodward testified from the header on the fax in question, his guess would be that it was sent from the fax machine in Internal Affairs, because that was the only place he knew for certain had a fax machine.

---

[16]The court is unable to ascertain the purpose of this EEOC charge other than to publicize that a sergeant had attempted to commit suicide in the mid-1980's and was not placed on administrative leave nor sent for a psychological evaluation. *See* amended complaint at ¶ 44; depo. of Williams at 85.

[17]Dr. Warren Jackson was selected to examine plaintiff by the personnel board, not the sheriff's department. Depo. of McCreless at 81.

[18]The court notes that Bryce is the state mental hospital, in Tuscaloosa, Alabama.

Depo. of Woodward at 117, 123-124. Because the fax was unsigned, Woodward did not know who sent it, however he assumed it was sent by a sheriff's department employee. Depo. of Woodward at 118, 122, 145. Williams testified he had never seen the letter before and did not know it existed. Depo. of Williams at 49.

McCreless testified he knew the plaintiff was referred for a psychological evaluation, but did not make Dr. Jackson's name known to other members of the Sheriff's Department and does not know who else would have been aware of Dr. Jackson's examination of plaintiff. Depo. of McCreless at 36. McCreless heard there was a letter written by deputies who were concerned for plaintiff. He further testified that he did not have anything to do with the letter actually being written. Depo. of McCreless at 38, 49. He was of the opinion that the letter was not official Sheriff's Office correspondence as it was not signed and not on Sheriff's Department letterhead. Depo. of McCreless at 38; *see also* depo. of Hale at 91-93. However, McCreless had heard some of the content of the letter previously, such as that the plaintiff had problems maintaining his uniform and had to be physically taken to get a haircut. Depo. of McCreless at 61-62. Williams testified that he had seen other manifestations of the behavior listed in the unsigned letter, such as the plaintiff becoming overaggressive in situations and seeming emotionally unable to deal with the situations confronting him in law enforcement. Depo. of Williams at 103-104.

Furthermore, the plaintiff alleges a news release by Sheriff Woodward regarding his placement on administrative leave was in retaliation and was done due to his failure to show

18

up for his evaluation, but this was because the Personnel Board changed his appointment so that they could place him on leave for his failure to show up at the first appointment. *Id.* at 227-229. The plaintiff states this was false, however he does not dispute this was why he was placed on administrative leave. *Id.* at 229.

The plaintiff also alleges that Dr. Jackson told him there was nothing wrong with him. Depo. of plaintiff at 231. Sheriff Woodward testified the report from Dr. Jackson stated that if the plaintiff was capable of performing his duties when he was originally hired, he was capable of performing them presently, so the Sheriff's Department kept him on the job. Depo. of Woodward at 59.

### D. The failure to promote and reassignment

The plaintiff testified he was transferred to the position of chief warrant officer of Jefferson County sometime at the end of 1997 or in 1998. Depo. of plaintiff at 112, 116. Neither his benefits nor his pay was changed by this lateral transfer. *Id.* at 117-118. The plaintiff testified he has asked to return to patrol on several occasions. *Id.* at 116.

The plaintiff also claims, apparently separate and apart from all of the above incidences, that he was denied a promotion based on his age. Plaintiff's depo. at 131-132. He testified he had taken the sergeant's exam at least twenty-six times, possibly more, and passed it every time. Depo. of plaintiff at 134, 176-177. His testimony continued:

> I mean, I have taken this test, I have passed, you know. My boss has tried to
> kill himself twice. What school do I need to go to in order to learn how to do

that?  How can I, you know – I need to get a face-lift or what?  What do I need to do?"

Depo. of plaintiff at 134.  The plaintiff also complains that he was not permitted to take the exam while on administrative leave, however the plaintiff admits the Jefferson County Personnel Board director made this decision.[19]  *Id.* at 135, 139-140.  The most recent sergeant's exam the plaintiff took before this time was in 1995.  Exhibit 1 to supplemental submission in support of defendants' motion for summary judgment.[20]  The plaintiff is aware that the County Personnel Board maintains a certification list for promotions based on exam scores.  Depo. of plaintiff at 136, 161.  The plaintiff admits he was not on the most recent certification list, but states this is because he was denied the right to take the exam.  Depo. of plaintiff at 253-254.  *See also* Exhibit 4 to defendants' submissions.  He also admits that the list of certified candidates is created by the Personnel Board, not the sheriff's office.[21]  *Id* at 255.  The plaintiff alleges that because he is thirteenth in seniority, he should have been promoted to sergeant.[22]  *Id.* at 142-144, 146, 150.  When questioned about this, Sheriff

---

[19]The director and the Board have both been dismissed from this litigation.

[20]According to the Personnel Board's records between 1980 and 1995, plaintiff took the Deputy Sergeant's examination nine times, passed six times, and was never certified.  Deputy Richmond was not certified to the Sheriff's Department because he was never in certifiable range.  Exhibit to supplemental submission.

[21]Sheriff Woodward explained that the sheriff receives a promotion list of eligible people from the Jefferson County Personnel Board from whom he selects someone for the position in question.  Depo. of Woodward at 70-71, 166.  He does not recall ever seeing the plaintiff's name on the list of eligibles.  *Id.* at 71.

[22]The plaintiff also states he should be promoted to lieutenant because he is older than Steve Greene and was never suspended for eating fried chicken at roll call as Lieutenant Greene

Woodward stated he saw nothing unusual in someone so senior still being a deputy, because "If you don't pass the promotion exams and get high enough on the promotion list to be promoted, you remain a deputy."[23] Depo. of Woodward at 101. Further, seniority is taken into account by the Personnel Board in creating the list of personnel certified as eligible by adding one point per year of service, up to twenty years. Depo. of McCreless at 135; depo. of James at 36. Both McCreless and James stated they were not aware of the plaintiff ever being certified by the personnel board for a promotion. Depo. of McCreless at 151; depo. of James at 67. Moore testified that to become a sergeant, one has to take and pass the examination, then be certified on the list of eligibles that is furnished to the sheriff's department. A review board then interviews and ranks the candidates on the list and the ranking is then furnished to the sheriff. Depo. of Moore at 15, 17; *see also* depo. of James at 17-18, 38.

---

apparently had been. Depo. of plaintiff at 151. Sheriff Woodward had no knowledge of this incident. Depo. of Woodward at 137. This incident actually occurred sometime around 1980. Depo. I of Greene at 58-59. The plaintiff states Don Williams is younger than him and was unfairly promoted to sergeant over him. He states Sergeant Williams tried to kill himself twice, which the plaintiff has never done. Depo. of plaintiff at 156. When asked if he complained about these promotions, he stated he has complained about it the whole time, for twenty-six years. *Id.* at 158.

[23]Since the time this suit was filed, the sheriff's department has made several promotions provisional on subsequent passing of the appropriate examination. *See e.g.* depo. of McCreless at 121, 123, 137-138. However, the court finds these type promotions were undertaken after this litigation was filed and therefore are not properly before this court in this case. Substantial testimony was given regarding the sheriff's office current undertaking to get out from under the personnel board system. Any failure to promote claim the plaintiff may be making would necessarily have to be under the system in place for promotions at the time he applied for a promotion and sat for the examination. The plaintiff submitted no evidence to show he has attempted to be considered for a promotion since the sheriff began making provisional appointments.

The plaintiff further testified that everybody with the sheriff's office starts their careers as deputies at the jail, and with each promotion they must return to work at the jail until an opening elsewhere is available. Depo. of plaintiff at 169. When asked if promoted would he be willing to do this, the plaintiff responded "I want to go back to Center Point day shift where I was removed from against my – ." *Id.* at 170. However, in 1995, the plaintiff had asked for a transfer to the Court Services division, in which he currently serves. Exhibit 26 to defendants' submissions. Woodward testified the plaintiff was transferred to this division upon recommendations from his supervisors to him. Depo. of Woodward at 102. Furthermore, James stated that the plaintiff came to him and asked to be transferred to "civil."[24] Depo. of James at 59.

### III. STANDARD FOR EVALUATING SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

---

[24]In sum, the plaintiff stated the following actions where in retaliation for his EEOC complaints: the conspiracy between Dr. Warren Jackson, Ben Payton and Jim Woodward to get him back to Smolian Clinic; the move to the warrant office (Court Services) from the Center Point office by Jim Woodward; and Mike Hale and Lynn Moore's denial of a promotion for plaintiff. Depo. of plaintiff at 244. However, the plaintiff recognized that the sheriff's office had severe staffing shortages and he could not be moved back to Center Point. Depo. of plaintiff at 250.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Federal Rules of Civil Procedure 56(e). In meeting this burden the non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Federal Rules of Civil Procedure 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson*, 477 U.S. at 249. The non-moving party must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). A factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment. *Brown v. American Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All "reasonable doubts" about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). However, all "doubts" need not be so resolved. *Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607, 609 (11th Cir. 1987).

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Holcombe v. Alabama Dry Dock & Shipbuilding*, 1998 WL 758012 (S.D.Ala.); citing *Anderson*, 47 U.S. at 251-252.

## IV. DISCUSSION

The court has considered all of the evidence in the light most favorable to the plaintiff and finds that the plaintiff has failed to raise any genuine issues of material fact for a jury to decide.

### A. The ADEA Claim

The defendants assert that they are immune from suit under the ADEA while acting in their official capacities. In *Kimel v. Florida Board of Regents*, – U.S. –, 120 S.Ct. 631, 650, 145 L.Ed.2d 522 (2000), the United States Supreme Court stated that in enacting the ADEA, Congress failed to abrogate the States' sovereign immunity. The Eleventh Circuit Court of Appeals has stated that a county sheriff is an officer of the state. *Turquitt v. Jefferson County*, 137 F.3d 1285 (11th Cir. 1998). Hence, neither of the remaining defendants can be found liable in their official capacities even if the court was to allow this case to proceed to a jury. As the defendants are wholly immune from suit for this claim, this court must dismiss the plaintiff's ADEA claims against the defendants in their official capacities.[25] Therefore, this claim shall be dismissed by separate order of the court.

### B. The ADA Claim

The ADA provides that no covered employer shall discriminate against a "qualified individual with a disability because of the disability of such individual with regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case under the ADA, the plaintiff must show that (1) he has a disability; (2) he is a qualified individual; and (3) he was discriminated

---

[25]*See infra* for a discussion of the defendants' immunity from suit in their individual capacities.

against because of the disability.  42 U.S.C. § 12132; *Swain v. Hillsborough County School Board*, 146 F.3d 855, 857 (11th Cir.1998); *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir.1996).  In addition, the plaintiff must show that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled.  *Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir.1996).

The plaintiff must establish that he is "disabled" as that term is defined by the ADA.  Without meeting such definition, the plaintiff is necessarily precluded from establishing that he was discriminated against due to a disability in violation of the ADA.  The ADA defines disability as (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; or (B) a record of such an impairment; or (C) being regarded as having such an impairment.  42 U.S.C. § 12102(2).  Plaintiff apparently argues that he falls within the first category of disability, as the plaintiff states that he "has been unable to participate in several major life activities."  Amended complaint at ¶ 8.  The United States Supreme Court examined subsection (A), above, and stated that an analysis under that subsection has three parts. These are (1) whether the plaintiff had a physical impairment; (2) identification of the life activity upon which plaintiff relies and determining whether it constitutes a major life activity under the ADA; and (3) whether the impairment substantially limits the life activity.  *Bragon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 2202 (1998).

Thus, to establish a prima facie case and survive summary judgment, the plaintiff must present sufficient evidence to create a genuine issue of material fact as to whether his

physical impairments substantially limit his ability to partake in a major life activity. *Swain*,

146 F.3d at 857; *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11ᵗʰ Cir.1996),

cert. denied, 522 U.S. 1030, 118 S.Ct. 630, 139 L.Ed.2d 610 (1997) ("Merely proving the

existence of a physical impairment, without addressing any limitation on major life activities,

is not sufficient to prove disability under the Act"). The EEOC defines major life activity

as, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing,

speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1996). "Substantially

limited" is defined by the EEOC for ADA purposes to mean:

(i) Unable to perform a major life activity that the average person in the general

population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which the

average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(1996). In deciding whether a major life activity has been

substantially limited, the EEOC provides several factors to consider:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term

impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)(1996).

In the instant action, the plaintiff has not identified any activity in which he cannot

participate, let alone a "major life activity." No medical records supporting the plaintiff's

claim of a disability resulting from an on-the-job injury in 1996 have been provided or even referenced. Moreover, no major life activity is alleged to be limited by this claimed impairment. As such, this court is unable to find any "major life activity" to be limited. While not specifically stated by the plaintiff, even if this court was to assume, for purposes of this order, that the plaintiff had alleged that his major life activity of working is affected, this court can find no evidence that the plaintiff is precluded from a class or range of jobs by his impairment.

While the plaintiff may have suffered from an injury, this is different from meeting the legal definition of "disabled." Plaintiff's impairment, by plaintiff's own account, resolved when his doctor released him back to regular duty. As such, his inability to work was not permanent, as is evidenced by the fact that the plaintiff was working at the same pay and for the same benefits as before his back injury occurred. An impairment temporary in nature cannot become a disability under the ADA. *See Skinner v. Atlantic Marine, Inc.*, 1997 WL 602446 (S.D.Ala.1997), at 4. Furthermore, a physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. *Gordon v. E.L. Hamm & Associates*, 100 F.3d 907 (11th Cir.1996). Similarly, not every disability entitles an individual to the protections of the ADA. *See Zillyette v. Capital One Financial Corp.*, 1 F.Supp.2d 1435, 1441 (M.D.Fla.1998).

The plaintiff also argues that he was regarded as disabled by his employer. The EEOC has explained that "regarded as having such a impairment" means a physical or

mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation.  29 C.F.R. § 1630.2(l)(1996).  A significant impairment is therefore one that is viewed by the employer as generally foreclosing the type of employment involved, not just a narrow range of job tasks.  *Gordon*, 100 F.3d at 913, citing 29 C.F.R. § 1630.2(j)(3); *Standard v. A.B.E.L. Services*, 161 F.3d 1318, 1327 (11th Cir.1998).  The plaintiff has put forth no evidence tending to show he was "regarded as" having a disability by his employer.

Based on a consideration of the above, this court finds that the plaintiff has failed to present evidence that would allow a rational finder of fact to find him suffering from a disability during the relevant time period as a matter of law.  Therefore, this claim shall be dismissed by separate order of the court.

### C. Title VII--Failure to Promote and Disparate Treatment

Separate and apart from plaintiff's claim that the failure for him to receive a promotion was due to his age, plaintiff possibly alleges that the failure for him to receive a promotion was due to religious discrimination, in violation of Title VII.  The plaintiff has offered no direct proof of such discrimination.  The evidence of discrimination before this court is wholly circumstantial in nature.  When evidence of discrimination is circumstantial in nature, the Supreme Court has fashioned a three prong test for focusing the court's examination of the evidence and allegations.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S.

248; 252-253; 101 S.Ct. 1089, 1093-1094 (1981); *Busby v. City of Orlando*, 931 F.2d 764,

777 (11th Cir.1991). First, the plaintiff must establish a *prima facie* case of discrimination.

*McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. Establishment of a *prima facie*

case creates a presumption that the employer unlawfully discriminated against the employee.

*Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Combs v. Plantation Patterns*, 106 F.3d 1519,

1527 (11th Cir. 1997). Meeting this burden creates a presumption of discrimination. *Combs*,

106 F.3d at 1528.

Assuming the employee meets this burden, the burden then shifts to the defendant to

articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment

action. *Harris v. Shelby County Board of Education,* 99 F.3d 1078, 1083 (11th Cir.1996).

The defendant can feasibly present such strong evidence of a nondiscriminatory rationale that

summary judgment is warranted. *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946,

950 (11th Cir.1991), *cert. denied*, 502 U.S. 1058 (1992)(quoting *Grigsby v. Reynolds Metals*

*Co.,* 821 F.2d 590. 596 (11th Cir.1987).

Once a defendant presents a legitimate, nondiscriminatory reason for its action, the

presumption of discrimination drops from the case. *Burdine,* 450 U.S. at 255, 101 S.Ct. at

1094 and n. 10.[26]  The plaintiff must then demonstrate by a preponderance of the evidence

---

[26]The disappearance of the presumption does not compel summary judgment in favor of a Title VII defendant.  The ultimate question remains the same:  whether the plaintiff can persuade the trier of fact that she has been the victim of intentional discrimination.  *See Howard v. BP Oil Co.*, 32 F.3d 520, 525 (11th Cir. 1994).

that the reason offered by the defendant was not the true reason for the employment decision, but rather a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.  The focus of the case after the defendant meets its burden of production is on the defendant's subjective intent and the motivation behind the defendant's adverse employment action directed at plaintiff.  *Harris*, 99 F.3d at 1083.

In a "failure to promote case," the plaintiff meets his prima facie burden of proof by establishing that (1) he is a member of a protected class; (2) he was qualified for the position for which he applied; (3) he was not selected for the position; and (4) the selected individuals included non-protected class applicants. *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. at 1824; *Walker v. Mortham,* 158 F.3d 1177, 1186 (11th Cir.1998). *See also Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir.1996).  The plaintiff here fails to get past step two of this four prong analysis as he cannot establish he was qualified for the position.  The plaintiff failed to produce any evidence that his name was ever included on a list for selection as a sergeant by the sheriff.  Although the plaintiff did take and pass the sergeant's examination six out of the nine times he took it, the most recent time he took and passed the test was before either of the defendants here became sheriff of Jefferson County.  Furthermore, the plaintiff failed to provide this court with any evidence that the Jefferson County Personnel Board knew or even suspected that the plaintiff was of Jewish ancestry and for that reason

refused to include his name on the qualified list of candidates from which the sheriff had to select his sergeants.[27]

This same lack of qualification also meets the defendants' burden, if it had been reached, of showing a legitimate, non-discriminatory reason for not selecting the plaintiff. *See e.g. EEOC v. Reichhold Chemicals*, 988 F.2d 1564, 1570 (11th Cir.1993); *Brown v. American Honda Motor Co., Inc.*, 939 F.2d at 950. The defendants state that the plaintiff was not one of the highest qualified candidates for the position. This has been found to be a legitimate, non-discriminatory reason for not promoting the plaintiff. *Harris,* 99 F.3d at 1084 (stating that the defendants in Title VII cases may prove as an affirmative defense that they would have reached the same employment decision even in the absence of bias); citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 246, 109 S.Ct. 1775, 1788, 104 L.Ed.2d 268 (1989). *See also Olafson v. Dade County School Board*, 651 F.2d 393, 395 (5th Cir. Unit B July 1981) ("It was ... incumbent on the plaintiff ... to prove he was the 'victim of intentional discrimination'"). Additionally, plaintiff was never certified to the Sheriff's Department because he was never in the certifiable range.

This court need go no further in the failure to promote analysis. The court finds as a matter of law that the plaintiff cannot meet his prima facie burden of proof for this case to reach a jury on this issue. This claim shall be dismissed by separate order of the court.

---

[27]Of course, even if the plaintiff could establish such an occurrence, this does not lend any weight to his case against Hale and Woodward as the undisputed testimony was that they had no authority over the names the personnel board certified to the sheriff as qualified.

The plaintiff also makes a claim that he was not promoted or otherwise suffered discrimination, such as being placed on administrative leave, because he engaged in protected activity, namely making repeated EEOC claims. Again, to establish a prima facie case of retaliation for engaging in protected activity, the court must use the *McDonnell-Douglas* burden shifting standard, discussed in detail, *supra*. The plaintiff must show that he (1) engaged in Title VII protected activity; (2) an adverse employment action occurred; and (3) a causal connection between the protected activity and the adverse employment action exists. *Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999); *see also Rabinovitz*, 89 F.3d at 487.

While the filing of an EEOC complaint is clearly a protected activity, the plaintiff cannot show an adverse employment action. Such action must be proven by a materially adverse change in the terms of employment, including, but not limited to significantly diminished responsibilities, demotion evidenced by a decrease in wage or salary, a less distinguished title, or loss of benefits. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-886 (6th Cir.1996); *Rabinovitz*, 89 F.3d 488. Here, the plaintiff has failed to establish any adverse change in the terms of his employment. He has not been terminated, his benefits have not been reduced, his responsibilities have changed, but there is no evidence they have been diminished, his title has not changed and his benefits have not changed.[28] The plaintiff

---

[28]Even if this court were to assume that subjecting the plaintiff to a psychological examination was an adverse employment action, this court cannot find that this was per se unreasonable in light of the plaintiff's behavior. Given that the plaintiff is endowed by the State

cannot show that he has been treated differently than non-Jewish deputies, nor that similarly situated deputies were treated differently than he was. While the plaintiff was transferred to a different division, he requested that very transfer two times previously.[29]

The court finds further that the plaintiff cannot show a causal connection between the protected activity and the failure to promote because the plaintiff sat for the sergeant's exam most recently in 1995 and did not file the first EEOC complaint until 1997. Furthermore, he fails to allege any specific event which would have caused anyone at the Sheriff's Department to retaliate against him when he filed his first EEOC complaint due to the "harassment" over his allegedly incomplete and substandard reports. The plaintiff's argument as to retaliation is apparently that his reports were criticized by Greene and Williams in retaliation, so he filed an EEOC complaint, so they took him off of patrol duty, so he filed an EEOC complaint, so they had him sent for a psychological evaluation, so he filed an EEOC complaint, so he was placed on administrative leave, so he filed an EEOC complaint, so he was transferred to the warrant office, so he filed an EEOC complaint. This court notes the obvious flaw in this entire retaliation scheme is that Greene and Williams had no reason to retaliate against the plaintiff to start off this sordid chain of events. The plaintiff

---

of Alabama with the authority to both carry and use a gun, this court finds that the sheriff's actions in addressing concerns regarding the plaintiff's behavior were imminently reasonable.

[29]The court also notes that while the plaintiff repeatedly stated during his deposition that he just wanted to go back to the Center Point substation on patrol, he also sues for the failure to promote and admits that if he made sergeant, he would have to go work at the jail, not at Center Point, for an unspecified amount of time.

has not produced any evidence in support of his allegation of retaliation except for the timing of events.

The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence. " *See e.g Combs*, 106 F.3d at 1530 (citations omitted). The plaintiff is unable to demonstrate any inconsistency or contradiction in the defendants' proffered legitimate reasons for not promoting the plaintiff. The plaintiff has offered only mere speculation that his EEOC complaints had any effect on the defendants' failure to promote him or the defendants' other actions the plaintiff alleges were in retaliation for the filing of EEOC charges.

Based on a consideration of the above, this court finds that the plaintiff has failed to meet his burden of establishing that he was subjected to religious discrimination or retaliation. However, even assuming this court found that the plaintiff had made out a *prima facie* case of religious discrimination or retaliation, the court finds that the defendant established very strong, nondiscriminatory reasons for its actions. The plaintiff has not provided any evidence that the reason stated by the defendant for the failure to promote was pretextual. As such, plaintiff has not met his burden to proceed past a motion for summary judgment.

Similarly, if the plaintiff is actually claiming that he endured a hostile work environment due to the hanging of the iron cross outside Lieutenant Greene's office, the plaintiff must show (1) he is a member of a protected class, (2) he was subject to unwanted harassment, (3) the harassment was based on his religion, (4) the harassment unreasonably interfered with his work performance and created a hostile environment, and (5) the defendant knew or reasonably should have known of the charged harassment and failed to implement prompt and appropriate corrective action. *See Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir. 1997).

Here, no co-employees knew the plaintiff claimed to be Jewish until after the time the iron cross was hung. Everyone deposed in this case with the exception of the plaintiff considered it to have been a joke. The sign was not directed at the plaintiff, not aimed at the plaintiff, not based on the plaintiff's religion, or otherwise in any way connected to the plaintiff. While the sign was in extremely poor taste, even as a joke, the court finds as a matter of law it cannot rise to the level of harassment based on religion. The only individual to connect the iron cross to Hitler and then to connect Hitler to the Holocaust and the Holocaust to the plaintiff's Jewish ancestry, was the plaintiff.

Therefore, these claims shall be dismissed by separate order of the court.

### D. 42 U.S.C. § 1983

The plaintiff also alleges he was deprived of rights and privileges by the defendants acting in concert and conspiring to deprive the plaintiff of his rights under the Alabama

Mental Health Consumers' Rights Act,[30] which according to plaintiff violates his First, Fourth and Fourteenth Amendment rights under the United States Constitution and hence is actionable under 42 U.S.C. § 1983. *See* second amended complaint at ¶¶ 69-75. The plaintiff has produced no evidence from which a reasonable jury could find in his favor on this claim.

The gist of this count of the complaint seems to be that after being sent for a psychological evaluation by the Jefferson County Personnel Board, Dr. Warren Jackson, at the Smolian Clinic, refused to release the records of this examination. However, the plaintiff states he has since received these records. Second amended complaint at ¶ 95. This court finds that Dr. Jackson, Smolian Clinic, and Ben Payton are no longer parties to this suit. The court further notes that the plaintiff has received the records he complains of not receiving. A such, the court finds the plaintiff's claims under 42 U.S.C. § 1983 are moot.

This court further finds that as state actors, the defendants are immune from suit under 42 U.S.C. § 1983 in their official capacities. This was clearly and succinctly stated in *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2313, 105 L.Ed.2d 45 (1989). In *Will*, the Court said, "the language of § 1983 also falls far short of satisfying the ordinary rule of statutory construction that if Congress intends to alter the "usual constitutional balance between the States and the Federal Government," it must make its intention to do so "unmistakably clear in the language of the statute" 491 U.S. at 65, 109

---

[30]See § 22-56-1 through 22-56-10 Alabama Code of 1975 as amended.

S.Ct. at 2309; citing *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985); *see also Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity. *Will,* 491 U.S. at 65, 109 S.Ct. at 2310.

Further, the sheriff is immune from suit in his individual capacity on all counts of the plaintiff's complaint. "Government officials performing discretionary functions generally are shielded from suit insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). *See also Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In the facts before this court, the plaintiff has alleged no specific statutory or constitutional right which was violated by the actions of either of the defendants. While plaintiff makes a loose allegation in his complaint that his state law right to see a copy of the results of a mental health examination requested by the sheriff was violated, he wholly fails to put forth any proof that the sheriff had any part in preventing his review of these test results. Given this the plaintiff has failed in his burden to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file'

designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro 56(e).

Similarly, the plaintiff complains that an unsigned letter from "Concerned Deputies of Jefferson County" was sent to Dr. Jackson in an attempt to have the plaintiff sent to Bryce. However, the plaintiff puts forth no evidence that this letter was sent by anyone within the control of the Jefferson County Sheriff's Department. No evidence of who sent the letter, beyond the plaintiff's assertion that it was sent from a Jefferson County Sheriff's Department fax machine, has been submitted. As such, this court finds that this letter would be inadmissible at trial. Furthermore, the court finds that the letter is not evidence that any constitutional right of the plaintiff has been violated.

The court already having found that the plaintiff has failed in his burden to go beyond the allegations of the complaint and put forth evidence showing that there is a genuine issue for trial regarding his failure to promote due to age and religious discrimination claims, the court finds as a matter of law that the defendants in their individual capacities can have no possible liability concerning these claims.

In consideration of the foregoing, the court finds that the defendant's motion for summary judgment on the plaintiff's 42 U.S.C. § 1983 claims is due to be granted. A separate order dismissing said claims shall issue.

### E. The State Law Claims

While this court has supplemental jurisdiction over plaintiff's state law claims for intentional infliction of emotional distress, slander and violation of the Alabama Mental Health Consumers' Rights Act pursuant to 28 U.S.C. § 1367(a), the court declines to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3). Because resolution of the remaining counts of the plaintiff's complaint depend on determinations of state law, those claims are best resolved by the Alabama courts. *See Baggett v. First National Bank of Gainesville,* 117 F.3d 1342, 1352-1353 (11th Cir.1997). The court notes that the plaintiff's state law claims will not be barred by the statutes of limitations in light of the tolling provisions of 28 U.S.C. § 1367(d).

As to the other counts of the plaintiff's complaint, sounding in federal law, this court, having considered all of the evidence submitted, finds that the plaintiff fails in his burden to set forth specific facts to show that there is a genuine issue of material fact of trial. Rule 56, Federal Rules of Civil Procedure. The evidence here is so one-sided that the defendant must prevail as a matter of law. *Holcombe v. Alabama Dry Dock & Shipbuilding Corp.*, 1998 WL 758012 (S.D.Ala. 1998); citing *Anderson*, 477 U.S. at 251-252.

40

## CONCLUSION

The court having considered the foregoing, and finding that the plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial, the court **ORDERS** that the defendants' motion for summary judgment on Counts I–IV of the second amended complaint is hereby **GRANTED**.  The claims are **DISMISSED WITH PREJUDICE**.   The plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**.  Each party is to bear its own costs.

**DONE** and **ORDERED** this the _____ 6 _____ day of July, 2000.


INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

41